Petition of **GEORGAKOPOULOS**, No. 421 of 1948.

United States District Court
E. D. Pennsylvania.
Jan. 28, 1949.

38

Thomas F. Mount, of Rawle & Henderson, Philadelphia, Pa., for petitioner.

. Philip Dorfman, Philadelphia, Pa., Herbert Lebovici, of Arkin, Lebovici & Kottler, New York City, for respondents Georgios Therianos, et al.

WELSH, District Judge.

The Consular Representative of the Consulate General of Greece petitioned this Court for an order for the arrest and removal of· four Greek seamen from the vessel S/S "syros" now in the Port of Philadelphia, for repatriation to Greece to answer charges of offenses against the Penal and· Disciplinary Code of the Merchant Law of·Greece. The seamen's exceptions to the petition on the ground of' lack of jurisdiction were dismissed, whereupon they sought a writ of prohibition in the Circuit Court precluding this proceeding.

The Circuit Court declined to pass upon the question of jurisdiction in the absence of findings of fact respecting the exact nature of the dispute, and dismissed the petition; that Court noted the existence of a substantial dispute as to the facts upon which the petition is based, and indicated that· if the dispute is one respecting wages, as asserted by the seamen, jurisdiction is not conferred upon this Court by the Treaty of ·1902, 33 Stat. 2122, as amended. We concur in the opinion previously filed herein (McGranery, ·J.) D.C., 81 F.Supp. 411, holding that the treaty is in force, that it has been abrogated and amended as to wage disputes by the Seamen's Act of 1915, 38 Stat. 1164, and that jurisdiction is dependent upon proof of difficulties and disorders on the vessel exclusively within the jurisdiction of the Consul, i.e., disputes other than those for wages. Our inquiry is therefore concerned with the facts forming the basis of charges of "assault, disobedience and mutiny" against the four seamen, and a determination as to whether such facts bring the controversy within the exclusive jurisdiction of the Consul. The trial was a protracted one due to language difficulties and the necessity for interpreting testimony and translating documents offered in evidence. From the trial record, we make the following,

### Findings of Fact

1. The petitioner is the Chief of the Marine Department of the General Royal

Consulate of Greece in the United States authorized to act for the Consul General in all consular matters including the enforcement of the Penal and Disciplinary Code of the Greek Mercantile Marine Department.

2. The respondents are Georgios Therianos, Manolis Kasmas, Andreou Mihail, and Spyridon Zannos. They are subjects of the Kingdom of Greece and merchant seamen on the S/S Syros, which is owned and operated by a citizen of Greece, registered in and flying the flag of that country, and presently in the Port of Philadelphia and the jurisdiction of this Court. The master, officers and crew of the S/S Syros are Greek nationals.

3. The petition is filed under Article 12 of the Greek Consular Convention of 1902, 33 Stat. 2129, duly ratified and proclaimed, which provides that consuls and consular agents shall have exclusive charge of the internal order of merchant vessels of their nation and shall take cognizance of differences between the officers and crew, particularly in reference to adjustment of wages and execution of contracts; and that the Courts in the United States shall render forcible aid to consular officers in such matters. The article of the Treaty giving exclusive jurisdiction to consuls in wage matters was abrogated by the Seamen's Act of 1915, which gave jurisdiction in such matters to the United States Courts, and the abrogation was agreed to by Greek authorities.

4. Seaman Zannos signed on the S/S Syros at Cardiff, England on May 31, 1948, and was discharged by Microulis, a Greek consular officer, at Baltimore on August 14, 1948 in accordance with orders of the Greek Mercantile Marine Ministry. His discharge was ordered by reason of charges pending against him of "refusal to perform services, mutiny, &c.", in violation of the Articles of the Penal and Disciplinary Code while previously serving on the S/S Kyvernitis. Zannos was notified of the charges by the Greek consular officer at Cardiff, England in December, 1947. Thereafter the petitioning consular officer in the United States was instructed by the Ministry of Merchant Marine to discharge

seamen against whom charges were pending and to prevent their being signed as members of the crews of any Greek vessel. The list of seamen charged with such offenses and furnished to the petitioner included the name of Seaman Zannos. Entry was made of the discharge in his seamen's book showing that the discharge was "by order of the Greek Ministry of Mercantile Marine charged according to the accusation".

5. Fireman Mihail signed on the S/S Syros at Cardiff, England May 31, 1948 and was discharged by the petitioning consular agent at New York on November 23, 1948 in accordance with the orders of the Greek Mercantile Marine Ministry. His discharge was ordered by reason of charges pending against him of violation of the Penal and Disciplinary Code of the Greek Mercantile Marine. While previously serving on the S/S Kyvernitis, Mihail was notified of the charges by the Greek consular officer at Cardiff in December, 1947. Thereafter the petitioner was instructed by the Ministry of Merchant Marine to discharge seamen against whom charges were pending and to prevent their being signed as members of the crews of other Greek vessels. The lists of seamen charged with such offenses included Fireman Mihail.

6. Seaman Kasmas was signed on the S/S Syros at Cardiff, England on May 31, 1948, and Seaman Therianos at Norfolk, Virginia on June 23, 1948. Both were discharged by the petitioner because of charges of "violation of the Penal Code in accordance with 43099, order of the Mercantile Ministry".

7. All of the crewmen respondents herein were employed under the terms of a collective agreement made at Cardiff, England on September 2, 1943 between the owners of Greek merchant vessels and representatives of the Greek seamen's unions, therein named. The Agreement provided for the payment of a bonus after six months continuous service and general regulations governing employment. The Agreement was made under the following circumstances: Prior to World War II, Greek merchant seamen were organized into the Pan Hellenic Federation (called PNO), a trade

union which functioned wholly within the Kingdom of Greece. Upon occupation of Greece by the central powers in 1942, about 9,000 of the 10,000 Greek seamen outside of Greece formed four unions covering different ratings, which unions confederated in 1943 into the Federation of Greek Maritime Unions (known as OENO), which concluded the collective agreement at Cardiff as aforesaid after wide circulation among and approval by its members. OENO has continued as a labor union of Greek seamen to the present time, maintaining its headquarters at Cardiff, and branches at New York and other ports.

8. The collective agreement of 1943 was given official effect by the Emergency Act No. 3276/1944, which authorized collective agreements between associations of ship owners and seamen considered representative in the discretion of the Minister of Greek Merchant Marine, fixing wages, bonuses and the terms and conditions of employment generally. Penalties were provided for violation of any collective agreement subject to the Act, and, if such violations fell within the provisions of the Penal and Disciplinary Code of the Merchant Marine, the penalty provided by the code.

Articles 33 to 39 of the code deal with "Assault, Insubordination and Mutiny" and provide punishment for, inter alia, offending superiors by words, threats or gestures; disobeying or opposing an official order to perform services on the vessel; assault or violent acts against the officers; combining or conspiring to refuse or oppose an order; or doing any act against the person, liberty, or authority of the officers.

9. In November, 1947, negotiations were conducted in Athens at the invitation of the Greek government in which the merchant ship owners, the maritime union of Greece, PNO, and the Federation of Maritime Unions founded at Cardiff, OENO, participated. The result was an agreement dated November 29, 1947, between the ship owners, and the PNO, which eliminated, inter alia, continuous service bonuses and the payment of extra compensation to seamen for opening and closing hatches in port. OENO refused to consent to modification of the existing collective agreement

with the ship owners, did not become a party thereto, and has persistently refused to accept or recognize the validity of the modification with respect to the employment of its members. The Greek Ministry had issued a regulation dated November 11, 1947 reciting the existence of disputes over demands of crews for extra pay for certain work and declaring that seamen were not entitled to extra pay for opening and closing hatches. Prior thereto a custom had been established by long usage and recognized by ship owners under which seamen were paid additional compensation for opening and closing hatches when longshoremen or others did not perform such work.

10. Beginning May 31, 1948, at Southhampton, England, the itinerary of the S/S Syros was: Wabana, Newfoundland; Cardiff, England; Norfolk, Virginia—June 23, 1948; Cherbourg, France; Rouen, France; Baltimore, Maryland—August 14, 1948; Algiers, North Africa—September 1, 1948; Phillippeville, Tunis; England; Narvic, Norway; and Philadelphia—November 9, 1948. When the steamship arrived at Wabana the crew were ordered to open the hatches. They refused to do so without additional pay, whereupon the chief officer agreed to pay them $100.00 and the work was performed. Upon return to Cardiff they again refused to open the hatches without extra compensation, which was refused, and the work was done by the officer personnel. At Norfolk a like demand was made and refused, and the opening and closing of the hatches was performed by shore workmen. The crew also refused to open and close the hatches at Cherbourg and Rouen unless they were paid $180.00, and the work was again performed by the ship's officers. At Baltimore the crew refused to open and close hatches except upon agreement for extra pay, whereupon the Master on instructions of the owner agreed to pay $120.00. The crew performed part of the work in closing the hatches and were paid $60.00.

11. The work of opening and closing the hatches required the services of the 8 seamen of the deck, the carpenter, and the boatswain. The demands for extra pay

for that work were made by the seamen of the deck, the fireman, and the men of the other departments of the ship comprising 18 or more men, and sometimes the entire crew. They testified that they all joined in these and other requests as an indication that they were united in the purpose of serving the welfare of their fellow workers, and sought to avoid the possibility of charges that a small number of them might be deemed an unlawful committee or group of leaders acting in violation of Greek laws.

12. On August 14, 1948 at Baltimore the S/S Syros was boarded by Microulis, a representative of the petitioner, who advised Zannos that he was discharged because of acts of mutiny, assault and disobedience previously committed aboard the S/S Kyvernitis, although there is no evidence of any difficulty aboard the S/S Kyvernitis other than the demand by the seamen thereon for the payment of the continuous service bonus provided for by the collective agreement of September 2, 1943. Zannos and Mihail had been denounced by the Greek Harbor Master at Cardiff in December, 1947 for unlawful acts aboard the S/S Kyvernitis, although they continued to be employed thereon until April 15, 1948, when they, together with Kasmas, were discharged at Newcastle, England, with the knowledge of the harbor master. Thereafter in May, 1948 all three seamen were signed on the S/S Syros by the same harbor master. There is no evidence of any complaint as to the services of these men aboard the S/S Kyvernitis by the master of the vessel or the harbor master.

13. On August 18, 1948 seamen Mihail, Kasmas and Therianos were summoned to the office of the petitioner in New York and advised that they would be discharged pursuant to instructions received from the Ministry of Merchant Marine. They in turn requested that they be paid the indemnity for discharge under Section 361 of the Greek Commercial Code and asserted the right to remain aboard until it was paid. The request was denied.

14. While the vessel was in Baltimore in August, 1948 and subsequent to the notice given to Zannos of his discharge, about 20 of the crew in concert requested the Master to re-sign Zannos as a member of the crew, notwithstanding his discharge by the consular officer. On August 18, 1948, the date of the sailing of the S/S Syros from Baltimore, the Master upon the authority of the ship owner offered to discharge Therianos, Kasmas and Mihail and to pay them indemnity or liquidated damages in accordance with Section 361 of the Greek Commercial Code, providing for payment in the event of discharge at the will of the Master. The offer was not promptly accepted, and in the meantime preparations were being made for sailing. Two of the Greek consular officers were aboard. The three seamen named declared their willingness to accept the Master's offer upon condition that Zannos be included, and that the notation in his seamen's book as to the reason for his discharge be eliminated.

The consular officers advised the seamen that they had waited too long, the vessel was about to sail, they could not be paid off, and would have to remain with the vessel, whereupon the consular officers left the ship. After they had left and the anchor was weighed, nearly all of the crew came to the pilot house and persisted in their request that Zannos be re-signed as a member of the crew in order to be eligible for all seamen's rights. The crew was ordered from the bridge. Zannos was retained aboard the ship on a daily wage basis equal to that of a seaman but was not restored to the crew list.

15. On August 24, 1948 the petitioner made a report to the Greek Ministry of Merchant Marine advising that Zannos and Mihail, who were charged with violation of the Penal and Disciplinary Code for acts committed aboard the S/S Kyvernitis, and Kasmas and Therianos, were constituted a committee for trying to influence the other crew members to coerce the Master with the object of securing illegal payments of money; that from the Master's log it appeared that the seamen had refused to open and close the hatches without additional compensation; that they had made unfounded protests concerning the food; that Therianos was circulating among the crew a protest against the actions of the Greek

Government against certain Greek seamen; and that illegal collections were being taken for the news organ of OENO, which he characterized as Communistic. The same day the petitioner by cable advised the Consul at Algiers of the above complaints and requested him to take action to have those men removed from the S/S Syros.

16. On August 26, 1948 the Greek Ministry of Merchant Marine cabled the Consul at Algiers, directing him to communicate with the Master of the vessel and to discharge and repatriate the respondent seamen and lift their seamen's books, giving them a common passport for short duration. The Consul did not comply with those directions.

The S/S Syros, after leaving Algiers, touched at Tunis, England and Norway, but no efforts were made at such stops to discharge and repatriate the respondents. The vessel arrived at Philadelphia on November 9, 1948 and after being in port two days, the crew engaged in a 4-hour work stoppage in protest against the execution in Greece of ten of their leaders, who had been condemned.

17. On November 19, 1948 upon instructions from the petitioner, Therianos, Mihail and Kasmas were taken to the petitioner's office in New York where they were notified that in accordance with the instructions of the Ministry of Greek Merchant Marine the petitioner was obliged to discharge them and to repatriate them to answer charges pending against them, and that until they answered those charges they were forbidden to serve as members of the crews of Greek vessels. The petitioner suggested that if they would voluntarily return he would advise the Greek authorities that they had complied with his order and that they would receive treatment accordingly. The respondents demanded the indemnity provided under Article 361 of the Greek Commercial Code which permits the Master to discharge seamen without obligation to prove that the seaman was at fault and required that a certificate of discharge be issued, and the seamen furnished with the means of repatriation. A seaman discharged without sufficient cause is entitled to an indemnity as therein provided in addition to his pay for services rendered. Petitioner advised the said respondents that they were not entitled to any payment under Section 361 by reason of the fact that they were discharged under charges by the Consul at the direction of the Greek Government. Thereafter, Therianos, Mihail and Kasmas returned to the vessel at Philadelphia and have refused to leave it, which action was reported to the Greek Ministry through the office of the petitioner.

18. On November 22, 1948, petitioner advised the Master of the S/S Syros that he had discharged respondents Therianos, Mihail and Kasmas by reason of the charges against them of violation of Articles 33 to 38 of the Penal and Disciplinary Code, that they were not entitled to any indemnity provided by Article 361. The Master was instructed to enlist the aid of local authorities to remove these respondent seamen under penalty of violating the Greek law, and that he should not pay them any wages or furnish them lodging.

19. The respondent seamen are members of the OENO, a federation of seamen's unions which was dissolved by the Greek Government in February, 1948 and is not now recognized by said Government as existing. The chief representative in this country of that organization has advised the members thereof that they are entitled to demand extra pay for opening and closing hatches, contrary to the regulations of the Greek Ministry of Merchant Marine.

20. By reason of the refusal of the OENO and its members to accept and approve the modification of the Cardiff collective agreement by the Athens Agreement of 1947, many disputes arose on Greek vessels as to the payment of bonuses claimed under the Cardiff Agreement and for extra services precluded by the agreement of 1947. Demands and requests for such bonuses and extra compensation have been characterized as unlawful by the Ministry of Merchant Marine and made the basis of charges against seamen of disobedience and mutiny under the Penal and Disciplinary Code. Approximately 600 seamen serving on 400 Greek vessels who have persisted in making demands for bonuses and wages contrary to the Athens Agreement

have been denounced to the Greek Ministry of Merchant Marine and charged with offenses of disobedience and mutiny.

21. The names of seamen so charged have been collected and distributed by the Ministry to the Greek Consular Officers, including the petitioner, directing the seizure of the seamen's books of the men so listed, their removal from Greek vessels upon which they were employed, and their repatriation to Greece to stand trial on the charges. The lists of seamen so charged have been duplicated by the petitioner and transmitted to Greek ship owners and Masters with directions to discharge all seamen named in the lists, to seize their seamen's books for transmittal to Greece, and not to engage any of them who might apply for shipment.

22. Within the past year disputes involving claims for bonuses and compensation for extra services in opening and closing hatches have occurred on approximately 20 to 25 Greek vessels in United States ports, involving about 40 seamen, which seamen have been denounced to the Ministry of Merchant Marine as violators of the Penal and Disciplinary Code.

23. No claim has been made in this proceeding by the respondent seamen that bonuses or wages are presently due by reason of their services on the S/S Syros. However, the assertion of their claim to the right to receive bonuses under the collective agreement of 1943 and to extra compensation for extra work, and their previous demands therefor, are the bases of the charges of disobedience and mutiny upon which the petitioner has discharged them and upon which he now seeks their arrest and repatriation to Greece. There is no evidence that the respondent seamen failed or refused to obey any orders of the Master or officers, other than their refusal to open and close hatches without the extra compensation claimed to be payable, nor is there any evidence of disturbances, violence, threats or other conduct constituting mutiny.

24. There is no evidence that the Master exercised his right to discipline or discharge any of the respondent seamen during their service on the S/S Syros, except to report to the Consular Officer their claims for extra compensation for extra work, their protests against the actions of Greek authorities in matters not involving operation of the ship and their financial support of their union and its publication, nor does it appear that the Master took any disciplinary action or sought to secure the discharge or apprehension of the men for repatriation and trial in Greece at any of the ports touched prior to the institution of this action in November of 1948.

The findings of fact submitted by the parties are in substantial conformity with the above findings and, so far as they may be deemed essential to the issue, they are adopted as the findings of the Court. We are not in accord however with the contentions of the petitioner that those facts establish a case requiring this Court to grant the relief sought.

 Under the Treaty with Greece the petitioner has exclusive charge of the internal order of the merchant vessels of his nation and of differences which may arise thereon at sea or in port. In such matters this Court may not interfere, except when disorders on a vessel are of such nature as to cause a breach of the peace or serious trouble in port or on shore. We are required, however, to render forcible aid to consular officers to arrest persons composing a crew in any matter within the exclusive charge of the consular officer. Matters involving a breach of the peace or trouble in port, and those in which jurisdiction is established by other authority are excluded. The Seamen's Act of 1915 gave jurisdiction to this Court of claims for wages by seamen, both American and foreign, and the sections of the treaty giving exclusive jurisdiction to consuls in matters of wages and execution of contracts were abrogated by amendment. It would therefore appear that where the facts justify a finding that the issue involves an adjustment of a wage dispute between a ship owner or officers and crews, the matter is not one of exclusive consular jurisdiction in which he may seek the aid of the Court; and where this Court has concurrent jurisdiction with the Consul, it may not extend its forcible aid in his summary disposition of

wage matters not within his exclusive jurisdiction.

The evidence indicates quite clearly that the principal controversy between the ship owner and the crew in this case arises out of claims for extra pay for opening and closing the hatches on the S/S Syros under a custom existing at the time of the collective agreement of 1943 and still prevailing, and the refusal of the crew to perform that work without extra pay. It appears also that three of the respondents, prior to their services on the S/S Syros, had asserted claims for wage bonuses for continuous service under the Cardiff Agreement while serving on the S/S Kyvernitis. Claims of both of those classes were in effect outlawed by the Athens Agreement of 1947, to which the respondents and their union were not parties, which agreement was adopted and is sought to be enforced by the Ministry of Mercantile Marine. A real issue is therefore raised as to the present legality and enforcibility of the Cardiff Agreement, the basis of the custom under which the respondents have claimed extra pay, and the effect to be given to the Athens Agreement of 1947 and adopted by the Ministry, with respect to seamen's wages or compensation.

■ Without a judicial determination of the rights of the respondent seamen to the compensation claimed, their conduct in refusing to do extra work without extra pay, and in claiming the bonus under an agreement they deemed to be still in force, has been characterized as unlawful disobedience for which they must be deprived of their seamen's credentials, repatriated and punished. That members of the crew protested against the actions of the Greek Government in a matter in which a large part of the Western World took issue, that they collected funds for their union, made some complaints as to the ship's food and concertedly solicited the Master to reinstate Zannos, were not of sufficient importance to induce the Master to impose disciplinary measures. Nor are they deemed sufficient to change the character of this dispute from one involving claims for compensation, to one involving mutiny or other disorder on the vessel for which this Court might provide an aid to punishment.

■ We conclude therefore that the differences between the Master, officers and crew of the S/S Syros arise out of claims for compensation for services and not out of disorders or other matters having to do with the internal order of the vessel of which the petitioner has exclusive charge, and we reach the following,

## Conclusions of Law.

1. This action is founded on the Treaty concluded between the United States and the Kingdom of Greece on November 19, 1902, 33 Stat. part 2, page 2122.

2. The jurisdiction of this Court to encertain the petition and to grant the relief requested is founded on Revised Statutes, §§ 4079, 4080 and 4081, Act of Congress, 22 U.S.C.A. §§ 256–258.

3. The disputes cognizable under the Treaty and Revised Statutes are limited to disputes between the Master and the Crew arising on the vessels at sea or in port as to which exclusive jurisdiction has been vested in the respective Consular officers.

4. That exclusive jurisdiction of the respective Consular officers over wage disputes was abrogated and vested in the Federal Courts by the LaFollete Act of March 4, 1915, Chap. 153, 38 Stat. 1164.

5. General crimes and offenses against each of the contracting nations not occurring aboard the particular vessel on which the offending seamen may be employed, are not cognizable either under the Treaty or under Revised Statutes, §§ 4079, 4080 and 4081.

6. Wage disputes between the Master and Crew having been withdrawn from the exclusive jurisdiction of the consul by the LaFollete Act of 1915 are not cognizable under the Treaty.

■ 7. All charges based upon acts arising on the S/S Kyvernitis or any place other than the S/S Syros cannot form the proper basis for these proceedings.

8. The dispute which occurred on the S/S Syros relating to the payment of extra compensation for opening and closing hatches was a wage dispute and as such is not cognizable under the Treaty.

**9.** The other charges filed against the seamen for illegal collections of monies on behalf of the OENO and the newspaper "Naftragatis", forming a ship's committee, formulating and circulating a telegraphic protest on behalf of their ten leaders who were sentenced to death, do not constitute a dispute between the Master and the crew and as such are not cognizable in these proceedings.

10. An order may be entered dismissing the petition at the cost of the petitioner.